[Cite as *State v. Wong*, 2016-Ohio-96.]

STATE OF OHIO )       IN THE COURT OF APPEALS
)ss:      NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT )

STATE OF OHIO                          C.A. No.       27486

    Appellee

    v.                                    APPEAL FROM JUDGMENT
                                    ENTERED IN THE
GLENN WONG                              COURT OF COMMON PLEAS
                                     COUNTY OF SUMMIT, OHIO
    Appellant                             CASE No.     CR 2013 03 0667

DECISION AND JOURNAL ENTRY

Dated: January 13, 2016

CARR, Presiding Judge.

{¶1}    Defendant-Appellant, Glenn Wong, appeals from his convictions in the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}    On the morning of February 24, 2013, Wong stabbed his wife of eleven years, Tami Wong, 103 times while their two young children watched.  The older child called 911, and multiple officers responded to the family's home.  Upon their arrival, the officers found Wong lying on top of Tami on the floor of their master bedroom.  Both Wong and Tami were covered in blood, and the police found two knives nearby.  Paramedics attempted to treat Tami, but she ultimately passed away as a result of her extensive injuries.  Before she died, Tami told the paramedics that Wong had attacked her while she was in bed.  Wong also spoke to the police and admitted that he had stabbed his wife.  According to Wong, he believed that Tami was having an affair and was going to divorce him.

{¶3} A grand jury indicted Wong on one count of aggravated murder with prior calculation and design, one count of aggravated felony murder, and one count each of murder, kidnapping, felonious assault, and domestic violence. Wong filed a notice of his intent to raise an insanity defense, and three separate sanity evaluations occurred. Two of the evaluators concluded that Wong was legally sane at the time he allegedly committed the foregoing crimes. The third evaluator, Dr. John Fabian, concluded that Wong suffered from a delusional disorder at the time of the alleged offenses, but could not definitively conclude that, due to the disorder, Wong did not know the wrongfulness of his acts. Accordingly, the State filed a motion in limine, seeking to preclude Dr. Fabian from testifying as an expert in support of Wong's insanity defense. The trial court held a hearing on the State's motion and ultimately granted it. Because Wong lacked expert testimony to support an insanity defense, the court precluded him from presenting that defense at trial.

{¶4} A jury found Wong guilty on all counts. The court then determined that all of Wong's counts were allied offenses of similar import. Pursuant to the State's election, the court merged each of Wong's separate counts with his aggravated murder count and sentenced him to life in prison without the possibility of parole.

{¶5} Wong now appeals from his convictions and raises four assignments of error for our review. For ease of analysis, we consolidate two of the assignments of error.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PRECLUDED THE TESTIMONY AND REPORT OF DEFENSE EXPERT REGARDING MR. WONG'S SANITY IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PLAIN ERROR WHEN IT PRECLUDED THE TESTIMONY AND REPORT OF DEFENSE EXPERT REGARDING MR. WONG'S SANITY RIGHT TO PRESENT A DEFENSE CLAUSE OF THE 6TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶6} In his first and second assignments of error, Wong argues that the trial court erred by not allowing Dr. Fabian to testify in support of his insanity defense. Specifically, he argues that the court abused its discretion when it precluded Dr. Fabian's testimony and, in doing so, deprived him of his right to present a defense. We disagree.

{¶7} "The admission or exclusion of expert testimony lies in the sound discretion of the trial court and will, therefore, not be overturned absent an abuse of that discretion." *State v. Bekelesky*, 9th Dist. Summit No. 24976, 2010-Ohio-2198, ¶ 6. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶8} The plea of not guilty by reason of insanity "is an affirmative defense that must be proven by a preponderance of the evidence." *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, ¶ 17. "The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused." R.C. 2901.05(A). "A person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves, * * * that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14).

{¶9} Wong sought to support his insanity plea strictly with the testimony of Dr. John Fabian. Dr. Fabian conducted a psychological evaluation of Wong and submitted his report to the court in October 2013. At the hearing on the State's motion to exclude his testimony, Dr. Fabian opined within a reasonable degree of psychological certainty that Wong was suffering from a mental disease or defect at the time he allegedly attacked his wife. Dr. Fabian specified that Wong had developed a "jealous and persecutory paranoid type" delusional disorder, stemming from his belief that his wife was having an affair. He could not opine within a reasonable degree of psychological certainty, however, that the delusional disorder had caused Wong not to know the wrongfulness of his actions. He explained that Wong's actions, standing alone, were strong indicators that he did not know the wrongfulness of his actions when he attacked his wife. In reaching his conclusion, however, Dr. Fabian testified that he also had to consider the statements that Wong had made during his evaluation. Dr. Fabian testified that, in several of those statements, Wong "stated essentially * * * that he was aware of the illegality of his offenses now and at the time." Because he was required to base Wong's assessment on both his actions and the statements he gave while being evaluated, Dr. Fabian was unable to conclude that Wong, as a result of his delusional disorder, did not know the wrongfulness of his actions at the time he committed them.

{¶10} The trial court noted that, to prove insanity, Wong had to show both (1) that he suffered from a severe mental disease or defect, and (2) that, as a result of the disease or defect, he did not know the wrongfulness of his actions at the time he committed them. The court excluded Dr. Fabian's testimony on the basis that it did not satisfy the second prong. The court noted that Dr. Fabian was the only witness that Wong had tendered in support of his insanity plea and that expert testimony was a threshold requirement to pleading insanity. Because Wong did

not have an expert who was willing to testify that he was legally insane when he attacked his wife, the court did not allow him to pursue an insanity defense at trial.

{¶11} Having reviewed the record, we cannot conclude that the trial court abused its discretion by excluding Dr. Fabian's testimony. Dr. Fabian readily admitted that he could not conclude, within a reasonable degree of psychological certainty, that Wong's delusional disorder caused him not to know the wrongfulness of his actions. He would not opine that Wong was legally insane when he attacked his wife, so, at best, his testimony would have been that Wong was suffering from a mental illness. Diminished capacity, however, is not a recognized defense in Ohio. *State v. Wilcox*, 70 Ohio St.2d 182 (1982), paragraph one of the syllabus. "[A] defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that, due to mental illness, intoxication, or any other reason, he lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime." *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, ¶ 69, quoting *State v. Cooey*, 46 Ohio St.3d 20, 26 (1989). In the absence of other evidence that Wong was legally insane at the time he attacked his wife, Dr. Fabian's testimony simply suggested that Wong suffered from a diminished capacity during the timeframe relevant to this appeal. Thus, Wong's use of his testimony "would have had a strong tendency to confuse the issues." *Taylor* at ¶ 70. Because Dr. Fabian would not testify that Wong was legally insane and his testimony was the only evidence upon which Wong relied in support of his insanity defense, the trial court did not abuse its discretion when it precluded him from testifying.

{¶12} Wong also argues that, by not allowing Dr. Fabian to testify, the court deprived him of his right to present a defense. Yet, "[d]ue process requires only 'that criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *State v. Hale*, 119 Ohio

St.3d 118, 2008-Ohio-3426, ¶ 46, quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984). "[T]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Hale* at ¶ 46, quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). Wong never challenged the trial court's ruling that he was required to present expert evidence in order to pursue an insanity defense. His only argument was that Dr. Fabian should have been allowed to testify as an expert. As noted, however, Dr. Fabian's testimony would have been confusing to the jury and would have improperly suggested that Wong had a diminished capacity at the time he attacked his wife. *See State v. Partin*, 9th Dist. Summit No. 19819, 2000 WL 960959, *1-2 (July 12, 2000); *State v. McDaniel*, 9th Dist. Summit No. 18805, 1998 WL 887184, *3-5 (Dec. 16, 1998). Because his testimony was inadmissible, the trial court did not offend Wong's due process rights by excluding it. *See Hale* at ¶ 46. Wong's first and second assignments of error are overruled.

### ASSIGNMENT OF ERROR III

> THE TRIAL COURT ERRED AS A MATTER OF LAW BECAUSE THE STATE FAILED TO ESTABLISH ON THE RECORD SUFFICIENT EVIDENCE TO SUPPORT THE CHARGES LEVIED AGAINST MR. [WONG] IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶13} In his third assignment of error, Wong argues that his convictions for aggravated murder, aggravated felony murder, and kidnapping are based on insufficient evidence. Specifically, he argues that there was insufficient evidence that he (1) acted with prior calculation and design, (2) acted knowingly, or (3) restrained Tami's liberty. We do not agree that Wong's three convictions are based on insufficient evidence.

{¶14} "Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 113, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The test for sufficiency requires a determination of whether the State has met its burden of production at trial." *State v. Edwards*, 9th Dist. Summit No. 25679, 2012-Ohio-901, ¶ 7.

{¶15} R.C. 2903.01(A) defines the offense of aggravated murder by prior calculation and design. It provides, in relevant part, that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." R.C. 2903.01(A). "Regarding prior calculation and design, the Ohio Supreme Court has held that there is no bright-line test * * *." *State v. Thomas*, 9th Dist. Summit No. 27405, 2015-Ohio-2377, ¶ 12, citing *State v. Taylor*, 78 Ohio St.3d 15, 20 (1997). Instead, "courts consider the totality of the circumstances in each case * * *." *State v. Guerra*, 9th Dist. Lorain No. 12CA010188, 2013-Ohio-5367, ¶ 6. Relevant circumstances include: (1) whether "the accused and victim [knew] each other, and if so, [whether their] relationship [was] strained"; (2) whether the accused gave "thought or preparation to choosing the murder weapon or murder site"; and (3) whether "the act [was] drawn out or an almost instantaneous eruption of events." (Internal quotations and citations omitted.) *Taylor* at 19. A jury may find prior calculation and design "based on the protracted nature of [a] murder." *State v. Allen*, 73 Ohio St.3d 626, 632 (1995).

{¶16} R.C. 2903.01(B) defines the offense of aggravated felony murder. It provides, in relevant part, that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit * * * kidnapping * * *." R.C. 2903.01(B). As it pertains to this appeal, the kidnapping statute provides that "[n]o person, by force, threat, or deception, * * * shall * * * restrain the liberty of the other person, for any of the following purposes: * * * to inflict serious physical harm on the victim * * *." R.C. 2905.01(A)(3). "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." Former R.C. 2901.22(A).

{¶17} Officer Jeremy Vecchio testified that Wong came to the Twinsburg Police Department on February 9, 2013. While there, Wong inquired about hiring a private investigator to follow his wife because he thought she was having an affair. Officer Vecchio asked Wong whether any physical altercations had taken place between him and his wife, but Wong denied that there had been any. Consequently, Officer Vecchio advised Wong that the police department could not help him and suggested that he consult an attorney. Although Officer Vecchio also suggested to Wong that it might be better to leave the marital residence and avoid a future confrontation, Wong stated that he "was going to stay and try to work it out with his wife."

{¶18} Fifteen days later, the Twinsburg Police Department received a 911 call in which the caller, Wong's daughter, stated that her father was "murdering [her] mom." S.W., who was 11 years old at the time of trial, testified that she and her brother were watching television in their family room while their parents were talking in their bedroom. At some point, Wong emerged from the first-floor master bedroom, walked into the kitchen, and then returned to the

master bedroom. Shortly thereafter, S.W. heard her mom scream "call 911" and hurried to the master bedroom to retrieve the cordless phone. She testified that she observed her father on top of her mother, but that she did not see any blood. While S.W. was on the phone with 911, her younger brother also came to the door of master bedroom and watched his parents. M.W., who was nine years old at the time of trial, testified that he saw both of his parents on the floor with his father on top of his mother. Although neither of the children testified that they saw their father with a knife, the State also introduced into evidence the 911 call that S.W. made. During the 911 call, both children screamed that Wong had a knife, and M.W. could be heard screaming that Wong was "sticking it into her."

{¶19} As a result of S.W.'s 911 call, numerous officers were dispatched to the Wong residence. Officer Patrick Quinn testified that the 911 call came in at 7:06 a.m. and officers arrived on scene at 7:11 a.m. Upon their arrival, S.W. and M.W. ran out of the house from the front door. Officer Quinn testified that, after entrusting the children to another officer, he and three of his fellow officers entered the home. All four officers testified that they heard screaming or moaning coming from somewhere inside the house. They followed the sounds to the master bedroom where they found Tami lying on the floor with Wong lying on top of her. Officer Brian Steele testified that Tami was face down on the floor and slightly on her left side. Meanwhile, Wong was on her right side, had his arms around her, and had one of his legs draped over her legs. Officer Steele testified that he and his colleagues immediately began shouting at Wong to move off of Tami. Wong slowly slid off of Tami, and the officers were able to handcuff him. Several of the officers then walked him out to the dining room table and sat him down so that the paramedics could attend to Tami. Officer Steele testified that Wong was

covered in blood and had numerous cuts on his fingers, but did not appear to be excited and obeyed all of their commands without incident.

{¶20} Commander Stephen Bosso was the first emergency medical technician to arrive at the Wong residence. He testified that, after he assigned a crew to aid Tami, he approached Wong and asked if he was hurt. Wong denied that he had been hurt or stabbed, and Commander Bosso confirmed that they only found some lacerations on Wong's fingers. According to Commander Bosso, Wong looked directly at him when he answered his questions and appeared to be lucid. John Knaus, one of the other medics who responded, likewise testified that Wong appeared calm while receiving treatment at the scene.

{¶21} The police initially took Wong back to the police station before transporting him to a local hospital to address the cuts on his hand. Officer Daniel Biada testified that Wong appeared stoic while at the station and did not display any real emotion. He accompanied Wong to the hospital and testified that, when the first nurse to attend to Wong asked him what brought him to the hospital, Wong replied that he "stabbed [his] wife about 7 a.m. this morning." Wong likewise admitted that he stabbed his wife when Detective James Scarl came to the hospital and read him his *Miranda* rights. Detective Scarl testified that Wong gave straightforward answers to his questions. According to Detective Scarl, Wong had a worried look on his face during their conversation, but did not appear to be excited or agitated.

{¶22} When the police responded to the Wong residence, Tami was still alive. Officer Eric Sawyer testified that he tried to help Tami while waiting for the paramedics. He stated that Tami was awake, but was "drenched in blood" and was having difficulty breathing. When he asked her what had happened, Tami stated that she was in bed when her husband started stabbing her.

{¶23} Kevin Rott, one of the paramedics who responded to the scene, testified that Tami was alert and responsive when he first arrived. He stated that Tami had an overwhelming number of injuries and was struggling to breathe. Although her voice was faint, Tami spoke to Rott and repeatedly indicated that she "was hurting all over." When he asked her what had happened, Tami stated, "I don't know. He just started to stab me." Rott testified that Tami went into full cardiac arrest while being transported to the hospital. Shortly thereafter, she was pronounced dead.

{¶24} Daniel Winterich, a special agent/supervisor at the Bureau of Criminal Investigation, testified that he was dispatched to the Wong residence approximately three hours after the stabbing to assist with the investigation. Winterich specialized in blood spatter analysis and examined the bloodstain patterns that he observed in the master bedroom. Additionally, he documented the layout of the house and dimensions of the rooms. Winterich described the Wongs' master bedroom as consisting of the bedroom itself and an attached master bathroom that contained a sink, bathtub, shower, and a separate water closet with a toilet. He testified that he discovered blood stains and transfer patterns on the bed in the master bedroom, on the carpet in that room and leading into the master bathroom, on the doorway and walls leading into the bathroom, on the walls by the shower, and on the doorknob and walls of the water closet. Winterich also testified that there were two steak knives in the Wongs' master bedroom; one in the bed itself and one on the floor next to the bed. Winterich inspected the Wongs' kitchen and determined that two of their steak knives were missing from the butcher block on the counter. He testified that it was 39 feet one way from the front of the Wongs' bed to the butcher block in the kitchen.

{¶25} Dr. George Sterbenz, the Chief Deputy Medical Examiner for the Summit County Medical Examiner's Office, performed Tami's autopsy. Dr. Sterbenz testified that Tami sustained at least 103 sharp force injuries. Specifically, she sustained 25 of those injuries to her head and neck, 19 to her torso, and 59 to her extremities. Dr. Sterbenz testified that there were 30 penetrating injuries to Tami's hands and wrists alone and that those injuries were consistent with defensive wounds one would receive from trying to fend off an attacker. Although Tami received several injuries that could have been fatal by themselves if inflicted earlier on in the attack, Dr. Sterbenz opined that Tami actually died as a result of blood loss. He testified that Tami died because "[s]he just lost so much blood over a long period of time from very many stab wounds."

{¶26} Wong argues that his aggravated murder conviction is based on insufficient evidence because there was no evidence of prior calculation and design. He argues that the stabbing was "a spur of the moment act," and not the result of any planning on his part. Yet, a jury may find prior calculation and design "based on the protracted nature of [a] murder." *Allen*, 73 Ohio St.3d at 632. The jury heard evidence that Wong stabbed Tami at least 103 times and that she died as a result of the enormous amount of blood she lost over an extended period of time. The jury could have concluded that Wong had time to consider his actions during the course of the murder and could have stopped stabbing Tami prior to killing her. *See id.*; *State v. Mount*, 9th Dist. Summit No. 26941, 2014-Ohio-5334, ¶ 31 ("[A]s to the element of prior calculation, * * * Mr. Mount had sufficient time and opportunity to contemplate his actions during the course of the murder, and could have chosen to stop the strangulation prior to killing [the victim]."). Moreover, the jury could have concluded that Wong had more than "a few fleeting moments of deliberation" before stabbing Tami. *State v. Hairston*, 9th Dist. Lorain No.

05CA008768, 2006-Ohio-4925, ¶ 80. The jurors heard testimony that Wong walked 78 feet roundtrip to retrieve two knives from the kitchen before walking back to the bedroom to stab Tami. They also heard testimony that his and Tami's marital relationship was strained because Wong believed that Tami was having an affair. *See Taylor*, 78 Ohio St.3d at 19-20. Indeed, only 15 days before the stabbing Wong went so far as to inquire at the police station about hiring a private investigator. Viewing all the evidence in a light most favorable to the State, we cannot conclude that the State failed to meet its burden of production on the element of prior calculation and design. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. Thus, we reject Wong's argument that his aggravated murder conviction is based on insufficient evidence.

{¶27} Next, Wong argues that there is insufficient evidence to support his conviction for aggravated felony murder because the State did not prove all the elements of kidnapping, the predicate offense for that charge. According to Wong, his kidnapping charge required the State to prove the he acted knowingly and that he restrained Tami's liberty. He argues that the evidence tended to show that he acted irrationally, not knowingly. Additionally, he argues that there was no evidence of restraint because, to the contrary, the blood patterns throughout the master bedroom and bathroom showed that Tami "was clearly moving about" while he was attacking her.

{¶28} Wong's kidnapping charge did not require the State to prove that he acted knowingly. The subsection of the kidnapping statute under which he was charged required the State to prove that he, by force, threat, or deception, restrained Tami's liberty for the purpose of inflicting serious physical harm on her. *See* R.C. 2905.01(A)(3). As noted above, there was evidence that he walked 78 feet to obtain two knives before stabbing Tami 103 times. The attack was long and brutal, and Tami suffered an extensive amount of defensive wounds, evidencing

that she tried to fend off Wong for some time while he continued to stab her. Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that Wong acted with the specific intention of causing Tami serious physical harm. *See* Former R.C. 2901.22(A); *Jenks* at paragraph two of the syllabus. Thus, we do not agree that the State failed to prove mens rea for purposes of the kidnapping statute.

{¶29} We also firmly reject the notion that Tami's unsuccessful attempts to move away from Wong as he was stabbing her 103 times amounted to evidence that he was not restraining her liberty. The fact that Tami may have managed to make it into the master bathroom at some point amidst the savage knife blows that she was enduring does not mean that she was free to move about. The jury reasonably could have concluded that, by stabbing Tami 103 time, Wong restrained her liberty. *See Jenks* at paragraph two of the syllabus. Accordingly, his argument that his aggravated felony murder conviction is based on insufficient evidence lacks merit. Wong's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

> MR. WONG'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶30} In his fourth assignment of error, Wong argues that his convictions for aggravated murder and kidnapping are against the manifest weight of the evidence. Because Wong has failed to set forth a weight argument, we reject his fourth assignment of error.

{¶31} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine

whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction. *Thompkins*, 78 Ohio St.3d at 387. *Accord Otten* at 340.

{¶32} Although Wong has asserted a manifest weight argument in his captioned assignment of error, he has not developed such an argument in the body of his brief. His brief merely asserts that the jury lost its way because "evidence was lacking." Yet, an assertion that evidence is lacking sounds in sufficiency rather than weight. *See State v. Poland*, 9th Dist. Medina No. 14CA0003-M, 2014-Ohio-5737, ¶ 23-24. Wong has not challenged the persuasiveness of any of the State's evidence and has not otherwise attempted to explain how the jury allegedly lost its way. We have already determined that Wong's aggravated murder and kidnapping convictions are based on sufficient evidence. "Because [he] has not developed an argument to support his manifest weight challenge, we decline to conduct a manifest weight analysis." *State v. Shannon*, 9th Dist. Lorain No. 13CA010517, 2015-Ohio-438, ¶ 25, quoting *State v. Auerswald*, 9th Dist. Medina No. 11CA0053-M, 2013-Ohio-742, ¶ 50. Accordingly, Wong's fourth assignment of error is overruled.

III.

**{¶33}** Wong's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

WHITMORE, J.
MOORE, J.
CONCUR.

APPEARANCES:

LEE A. SCHAFFER, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.