[Cite as *State v. Tighe*, 2016-Ohio-7031.]

STATE OF OHIO      )             IN THE COURT OF APPEALS
                       )ss:           NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT      )

STATE OF OHIO                            C.A. No.       27779

     Appellee

     v.                                   APPEAL FROM JUDGMENT
                                    ENTERED IN THE
DANIEL TIGHE                            COURT OF COMMON PLEAS
                                    COUNTY OF SUMMIT, OHIO
     Appellant                          CASE No.      CR 2013-10-2760

DECISION AND JOURNAL ENTRY

Dated: September 28, 2016

---

SCHAFER, Judge.

{¶1} Defendant-Appellant, Daniel Tighe, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} On August 10, 2013, the Tallmadge Police Department discovered the bodies of Wendy Ralston and her five-year old son, Peyton, in the woods behind the duplex she shared with Tighe. The bodies of both Wendy and Peyton were wrapped in blankets that came from the duplex, and Peyton's body was wrapped along with several of his stuffed animals. Tighe, Peyton's father, had moved in with Wendy and Peyton a few months before and was still residing at the duplex when the police found their bodies. Tighe informed the police that he last saw Wendy and Peyton on July 23rd and thought that they were on vacation. The police soon learned, however, that Tighe and Wendy had a tumultuous relationship and serious financial

problems. Following their initial investigation, the police arrested Tighe for the murders of Wendy and his son.

{¶3} A grand jury indicted Tighe on (1) one count of aggravated murder, with respect to Peyton; (2) one count of murder, with respect to Wendy; (3) two counts of tampering with evidence; (4) two counts of domestic violence; and (5) two counts of gross abuse of a corpse. Tighe's aggravated murder count also contained two attendant, capital specifications. Following a significant period of motion practice, a jury trial was held. The jury ultimately found Tighe guilty on all counts and, following the mitigation phase of the trial, found him guilty of the capital specifications linked to his aggravated murder count. Nevertheless, the jury recommended a sentence of life without the possibility of parole.

{¶4} The trial court adopted the jury's sentencing recommendation and sentenced Tighe to life without the possibility of parole on the charge of aggravated murder. Additionally, it imposed a term sentence on several of Tighe's other counts, to be served consecutively with his sentence of life without parole.

{¶5} Tighe now appeals from his convictions and raises four assignments of error for our review. For ease of analysis, we rearrange several of the assignments of error.

## II.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN NOT SUPPRESSING THE ORAL STATEMENTS APPELLANT TIGHE MADE TO INVESTIGATING OFFICERS WHEN UNDER THE TOTALITY OF THE CIRCUMSTANCES, HE WAS SUBJECT TO CUSTODIAL INTERROGATION AND THE INTERROGATING OFFICERS FAILED TO GIVE APPELLANT TIGHE THE WARNINGS REQUIRED BY MIRANDA V. ARIZONA (1966), 384 U.S. 436, THEREBY VIOLATING HIS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION[.]

{¶6}     In his third assignment of error, Tighe argues that the trial court erred by denying his motion to suppress certain oral statements that he made to members of law enforcement. We do not agree.

{¶7}     A motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Thus, a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 (4th Dist.1997).

{¶8}     "Pursuant to the Fifth Amendment of the United States Constitution, no person shall be compelled to be a witness against himself." *North Ridgeville v. Hummel*, 9th Dist. Lorain No. 04CA008513, 2005-Ohio-595, ¶ 27. "When a suspect is questioned in a custodial setting, the Fifth Amendment requires that he receive *Miranda* warnings to protect against compelled self-incrimination." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, ¶ 34, citing *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). "Custody" for purposes of entitlement to *Miranda* rights exists only where there is a "'restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983), quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "Whether a suspect is in custody depends on the facts and circumstances of each case." (Internal quotations and citations omitted). *State v. Lerch*, 9th Dist. Summit No. 26684, 2013-Ohio-5305, ¶ 8. "Relevant factors include the location

of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." (Internal citations omitted.) *Howes v. Fields*, ___ U.S. ___, 132 S.Ct. 1181, 1189 (2012). "The test is whether, under the totality of the circumstances, a reasonable person would have believed that he was not free to leave." (Internal quotations and citations omitted). *Lerch* at ¶ 8.

**{¶9}** On appeal, Tighe argues that the trial court erred by not suppressing oral statements he made to the police on three different dates: August 10, 2013; August 12, 2013; and September 17, 2013. He argues that the police subjected him to custodial interrogations in the absence of any *Miranda* warning. He also argues that, after he invoked his right to counsel, the police continued to interrogate him. Tighe does not analyze any of the specific facts or circumstances surrounding the foregoing dates. Instead, his assignment of error contains Fifth Amendment case law and general allegations that the police violated his rights.

**{¶10}** Initially, we note that the police never spoke with Tighe on August 12, 2013. The record reflects that the police spoke with him on August 11, 2013. On that date, they transported him to and from the Bureau of Criminal Investigation ("BCI") for questioning. Because Tighe refers to the August 12th date as the date he was questioned at BCI, we presume that his brief contains a clerical error regarding the date of that occurrence. Accordingly, we review his argument as applied to the questioning that occurred on August 11, 2013.

**{¶11}** When Tighe initially filed his motion to suppress, he sought to suppress the oral statements he made to the police on the three aforementioned dates. At the hearing on his motion, however, defense counsel refined Tighe's suppression challenge. Defense counsel informed the court that he had reviewed the recordings of the interviews that took place on

August 10, 2013, and learned that Tighe was Mirandized twice that day. Consequently, he informed the court that he and his co-counsel did not "believe there [was] a suppression issue with the statement on August the 10th of 2013."

{¶12} As for the statements Tighe made on August 11, 2013, defense counsel acknowledged that the State had agreed not to use them in its case-in-chief. Defense counsel informed the court that the August 11th interview was relevant only because, near the end of the interview, Tighe invoked his right to counsel. It was defense counsel's position that Tighe's invocation meant that the police could not question him again on September 17, 2013. Consequently, defense counsel did not ask the court to determine the admissibility of Tighe's August 11th statements. Defense counsel specifically informed the court that Tighe was only seeking to suppress oral statements he made on three different dates: July 4, 2013; July 31, 2013; and September 17, 2013.

{¶13} In denying Tighe's motion to suppress, the court wrote that it was only considering the admissibility of the statements Tighe made on July 4th, July 31st, and September 17th. The court wrote that Tighe had withdrawn his motion insofar as it pertained to his August 10th statements. As to his August 11th statements, the court wrote that the State had agreed not to use them in its case-in-chief and both parties had agreed that (1) Tighe had invoked his right to counsel on that date, and (2) the police were aware that he asserted his right to counsel. The court ultimately declined to suppress the statements Tighe made on July 4th, July 31st, and September 17th.

{¶14} Tighe's appellate brief essentially duplicates his original motion to suppress and ignores the amendments that his former counsel made to that motion at the suppression hearing. He asks this Court to conclude that the lower court erred by not suppressing his August 10, 2013

and August 11, 2013 statements. In doing so, he fails to address the fact that his former counsel asked the court not to consider the admissibility of those statements. Even assuming that Tighe forfeited rather than waived his argument regarding those statements in the court below, this Court will not address them for the first time on appeal. *See State v. Raber*, 9th Dist. Wayne No. 13CA0020, 2014-Ohio-249, ¶ 19. The record contains limited information about those statements, and Tighe has not set forth a claim of plain error. This Court has repeatedly held that "[i]f an argument exists that can support this assignment of error, it is not [our] duty to root it out." *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998). Accordingly, to the extent Tighe's assignment of error concerns the statements he made on August 10, 2013, and August 11, 2013, it is overruled.

**{¶15}** We next consider the admissibility of the oral statements that Tighe made to the police on September 17, 2013. As previously noted, the parties stipulated in the lower court that Tighe invoked his right to counsel on August 11, 2013. Tighe argues that, because he invoked his right to counsel on that date, the police violated his due process rights by interviewing him without counsel on September 17th.

**{¶16}** Detective Douglas Bohon testified that he knew Tighe had invoked his right to counsel on August 11, 2013. According to Detective Bohon, a prosecutor from the Summit County Prosecutor's Office researched the issue of whether the police were permitted to speak with Tighe following his decision to invoke his right to counsel. Detective Bohon was told that, after a 14-day break in custody, he could once again ask Tighe to submit to an interview. Consequently, on September 17th, he drove to a camper where he knew Tighe was staying. He testified that he wanted to interview Tighe again on that date because he needed help clarifying certain points in his investigation.

{¶17} Detective Bohon testified that he knocked on the door of Tighe's camper and Tighe came outside. He asked Tighe if he would be willing to speak with the police again, and Tighe agreed to do so. Detective Bohon then drove Tighe to the police station, where he was offered and provided with a coffee. Detective Bohon testified that Tighe was told that he was not obligated to be at the station, that he did not have to answer any questions, and that he could leave at any time. Detective Bohon further testified that, before any questioning began, Tighe was Mirandized. Tighe was then interviewed for approximately one and a half hours and never said that he either wanted a lawyer or did not want to speak. When the interview concluded, the police drove him back to his camper.

{¶18} It is well settled that "law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation." *Davis v. United States*, 512 U.S. 452, 454 (1994), citing *Edwards v. Arizona*, 451 U.S. 477, 484-485 (1981). Pursuant to *Edwards v. Arizona*, questioning may not resume until counsel is made available or "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards* at 484-485. In the latter instance, the State may not ask additional questions until the defendant knowingly, intelligently, and voluntarily waives his right to counsel. *See State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, ¶ 51-52, citing *Edwards* at 486. "This bright-line test prevents the police from wearing down and confusing the defendant to obtain a waiver of his rights." *State v. Knuckles*, 65 Ohio St.3d 494, 496 (1992). Yet, the protections set forth in *Edwards* do not apply when a defendant "experience[s] a break in *Miranda* custody lasting more than two weeks between the first and second attempts at interrogation * * *." *Maryland v. Shatzer*, 559 U.S. 98, 117 (2010). In those instances,

> [t]he protections offered by *Miranda*, which [] have [been] deemed sufficient to
> ensure that the police respect the suspect's desire to have an attorney present the

first time police interrogate him, adequately ensure that result when a suspect who initially requested counsel is reinterrogated after a break in custody that is of sufficient duration to dissipate its coercive effects.

*Shatzer* at 109. As such, if an individual asserts his right to counsel and the State responds by allowing at least a two-week break in custody, the State need only ensure a voluntary *Miranda* waiver before another custodial interrogation may occur. *Id.* at 111.

{¶19} At Tighe's suppression hearing, the State argued that the court should deny Tighe's motion to suppress on the basis of *Shatzer*. Defense counsel was not familiar with the case and asked for additional time to review it and supplement his motion with any contrary case law. The trial court granted his request, but defense counsel never supplemented his motion. At a status conference that occurred nine days before the court issued its suppression ruling, defense counsel informed the court that he had not found "any case law that would contradict the [*Shatzer*] case that was cited by the state regarding the 14-day break in interrogation." In denying Tighe's motion to suppress the statements he made on September 17th, the trial court relied on *Shatzer*.

{¶20} It is undisputed that Tighe invoked his right to counsel on August 11, 2013. The police did not seek to question him again until September 17, 2013. During that five-week break, Tighe was not in custody. Accordingly, the police allowed a sufficient break in custody to occur so that they could interrogate him again if he voluntarily waived his *Miranda* rights. *See Shatzer*, *supra*.

{¶21} Detective Bohon testified that he drove to the camper where Tighe was staying and asked him if he would be willing to come to the police station for another interview. Tighe agreed and accepted a ride to the station. At the station, he was given a beverage and was told that he did not have to stay there, did not have to answer any questions, and could leave at any

time. He was then Mirandized and interviewed. Detective Bohon confirmed that, during the interview, Tighe never invoked his right to remain silent or his right to an attorney. At the end of the interview, the police drove him back home.

{¶22} Even assuming that Tighe was in custody on September 17th, the record supports the trial court's conclusion that he voluntarily waived his *Miranda* rights that day. Tighe has not addressed any of the trial court's factual findings or its reliance on *Shatzer*. In fact, his brief does not contain a single citation to the suppression hearing transcript or to *Shatzer*. *See* App.R. 16(A)(7). Instead, it contains a blanket statement that, after he invoked his right to counsel, no further interrogations could occur. It is an appellant's burden to "set[] forth an argument on appeal and point[] this [C]ourt to applicable, legal authority in support of that argument." *State v. Raber*, 189 Ohio App.3d 396, 2010-Ohio-4066, ¶ 30 (9th Dist.). As noted above, "[i]f an argument exists that can support [an] assignment of error, it is not [our] duty to root it out." *Cardone*, 1998 WL 224934, at *8. Tighe has not shown that the court erred by denying his motion to suppress. Consequently, his third assignment of error is overruled.

ASSIGNMENT OF ERROR I

THE EVIDENCE IN THIS CASE WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT A CONVICTION OF AGGRAVATED MURDER AND, AS A RESULT, APPELLANT TIGHE'S RIGHTS AS PROTECTED BY ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED[.]

{¶23} In his first assignment of error, Tighe argues that his convictions are based on insufficient evidence. Specifically, he argues that there was insufficient evidence that he was the individual who perpetrated the crimes against Wendy and Peyton Ralston. We disagree.

{¶24} A sufficiency challenge of a criminal conviction presents a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In carrying out this

review, our "function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. After such an examination and taking the evidence in the light most favorable to the State, we must decide whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

{¶25} Tighe was convicted of the aggravated murder of Peyton Ralston and the murder of Wendy Ralston. Additionally, with respect to both Peyton and Wendy, he was convicted of tampering with evidence, domestic violence, and gross abuse of a corpse. Tighe does not argue that the State failed to prove the individual elements of any of the crimes of which the jury convicted him. Instead, he argues that there was insufficient evidence that he perpetrated the crimes.

{¶26} "[I]dentity of the perpetrator is an essential element that must be proved beyond a reasonable doubt." *State v. Johnson*, 9th Dist. Lorain No. 13CA010496, 2015-Ohio-1689, ¶ 13. "As with any other element, * * * identity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value." *State v. Taylor*, 9th Dist. Summit No. 27273, 2015-Ohio-403, ¶ 9. Because Tighe limits his sufficiency challenge to the issue of identity, we confine our analysis to that issue. *See State v. Webb*, 9th Dist. Summit No. 27424, 2015-Ohio-2380, ¶ 6.

{¶27} Marie Ralston is Wendy Ralston's mother and Peyton Ralston's grandmother. She testified that Peyton was born at the end of 2007 and that Tighe is his father. For the first two years of Peyton's life, Wendy and Tighe were in a relationship and lived together with their

son. After Peyton turned two years old, Wendy and Tighe ended their relationship, and Wendy moved elsewhere with Peyton. Ralston testified that Wendy and Peyton ultimately moved into a two-story duplex on Stone Creek Drive. Then, in April 2013, Tighe was evicted from his residence and asked Wendy if he could stay with her. Although Wendy and Tighe were no longer dating, Ralston testified that Wendy still had regular contact with him because of Peyton. She testified that Wendy allowed Tighe to move into the first floor of the duplex while she and Peyton stayed on the second floor.

{¶28} According to Ralston, things quickly became stressful once Tighe moved in with Wendy and Peyton. She testified that Tighe did not have a job and had never paid child support, so money was tight. In May 2013, Wendy called Ralston and, as a result of that conversation, Ralston called the police. According to Ralston, Wendy was very distressed during their phone call and she could hear Tighe yelling in the background. Based on the information she received from Wendy during the call, Ralston told the 911 operator that Tighe had just struck Peyton and had pushed Wendy. The State presented evidence that the police responded to Wendy's residence, but that no arrests were made because officers could not determine who had been the primary physical aggressor. Nevertheless, Ralston testified that the situation escalated further in June 2013, when Wendy lost her job. At that point, Wendy and Tighe were experiencing serious financial problems, and Wendy's landlord had started the eviction process.

{¶29} On July 4, 2013, Wendy called the police department to report an unwanted guest in her home. Sergeant Carl Woofter testified that he arrived at Wendy's residence along with Officer Jonathan Wright. Tighe answered the door when they knocked. Once the officers went inside, Sergeant Woofter went upstairs with Wendy and Peyton while Officer Wright remained on the first floor with Tighe. Sergeant Woofter estimated that he spoke with Wendy for ten

minutes and testified that she wanted Tighe removed from her home. After Sergeant Woofter explained that she would have to pursue an eviction to force Tighe from the home, Wendy played him a recording. On the recording, a male and female voice bickered and the male voice stated: "you two are the worst things that have ever happened to me and I wished that you were never born." Sergeant Woofter testified that he asked Tighe about the recording after hearing it and Tighe admitted that he had made those statements about Wendy and Peyton. Although both Sergeant Woofter and Officer Wright testified that they encouraged Tighe to leave Wendy's home and offered to take him elsewhere, Tighe declined.

{¶30} As further evidence of the mounting tension that existed in the home where Wendy, Tighe, and Peyton were residing, the State introduced a series of videos that Tighe recorded on his cell phone. The videos depict various interactions between Tighe and Wendy and Tighe and Peyton. In several of the videos, Wendy is aware that Tighe is recording her, but, in others, Tighe surreptitiously records Wendy's voice from upstairs while positioning himself at the bottom of the stairwell. The videos depict multiple arguments between the two. In several of the videos, Wendy cries and screams at Tighe to leave her house while Tighe continues to engage and antagonize her. The videos also capture Tighe repeatedly accusing Wendy of assaulting him while Wendy accuses Tighe of the same. Amidst the screaming, physical assault allegations, and obscenity in several of the videos, one can observe Peyton running around the house and yelling at Tighe while he and Wendy fight. Detective Douglas Bohon testified that the videos were recorded between July 10, 2013, and July 12, 2013.

{¶31} Marie Ralston testified that she last spoke with Wendy on July 21, 2013, and that she and Wendy exchanged text messages on July 23, 2013. Ralston stated that Wendy became angry with her when they last spoke, so she initially was not surprised when several days passed

without further word from her daughter. As more days passed and Wendy did not answer the new messages that Ralston and her granddaughter sent, however, Ralston became concerned. She testified that her concern greatly escalated when she learned that Wendy had failed to appear at her eviction hearing. On August 7, 2013, Ralston drove to Wendy's home to try to contact her daughter directly.

{¶32} Unbeknownst to Ralston, the Tallmadge Police Department conducted a welfare check at Wendy's home on July 31, 2013. Cynthia Abbott testified that she was a former neighbor of Wendy's and, on that day, she asked the police to check in on Peyton and Wendy. Abbott testified that Peyton came to her daughter's birthday party on July 21st. Either one or two days later, Abbott took her dog outside and heard Peyton screaming. She testified that it was approximately 10:00 or 11:00 a.m. when she heard Peyton screaming, "Mommy, get up." According to Abbott, Peyton sounded panicked and distraught, so she stood there and listened for a short while. She ultimately decided to go back inside, however, because she did not want to appear to be eavesdropping and she was unsure whether anything was actually wrong. She testified that she went back outside about four hours later. At that point, she saw Wendy's door and windows were closed and all of her blinds were drawn. Abbott testified that she noted the closed door and windows because it was very unusual for Wendy to have any of the windows closed. She further testified that, from that point forward, the windows remained closed and the only activity she noticed at the home was the flickering of a television at night.

{¶33} Abbott also testified that, near the end of July, she began to notice a foul odor when she would spend time outside her home. Specifically, she stated that, when the wind would shift, she would smell something "like a rotting fish." Having not seen or heard from

Peyton since July 22nd or 23rd, Abbott decided to call the police. On July 31st, she contacted the Tallmadge Police Department and asked them to check on Peyton and Wendy.

{¶34} Officer Wright testified that he went to Wendy's home on July 31st to conduct a welfare check along with two other officers. Officer Wright and another officer knocked on the front door while a third officer walked around and waited by the gate of the fenced-in backyard. When no one answered the door after several minutes, Officer Wright walked to the backyard with his fellow officers. They then walked through the gated fence, onto the deck, and checked the back door. Officer Wright testified that the door was unlocked and, due to the nature of the call they received, he and his fellow officers decided to open the door and call into the house. Once again, no one answered, so the three officers went inside. Although no one was at home, Officer Wright testified that they found a warm pizza on top of the oven. Finding nothing out of place, the officers left.

{¶35} Abbott testified that she spoke with one of the officers who conducted the welfare check at Wendy's residence before they left the area. Because the officer told Abbott to call the station again if she noticed any activity at the residence, Abbott kept watch. She testified that, about ten to fifteen minutes after the police left, she saw Tighe emerge from between two nearby houses. She then saw him lean over and look down the street before running across it and into Wendy's backyard. After Tighe ran into the backyard, Abbott called the police again to tell them he had returned to the residence.

{¶36} Officer Wright testified that he was still in the area when he received a call to return to Wendy's residence. He and another officer arrived shortly thereafter and found Wendy's front door still locked. They then walked around to the side of the duplex and encountered Tighe in the side yard. Officer Wright testified that he asked Tighe where he had

been and Tighe replied that he had gone for a walk. Officer Wright then asked Tighe if he knew where Wendy and Peyton were. According to Officer Wright, Tighe responded that he did not know, but that Wendy had said she and Peyton were going on vacation. Tighe further stated that Wendy "would often go with men and not tell him where she was going." Because the officers did not perceive anything that would have caused them to investigate further, Officer Wright testified that they left the scene.

{¶37} Kelli Pflugh testified that she and her family resided on the other side of the duplex where Wendy, Peyton, and Tighe lived. She estimated that Tighe moved in with Wendy and Peyton in the spring of 2013. While Tighe lived with Wendy, Pflugh frequently heard or saw disagreements between them and testified that they regularly tried to involve her. On several occasions, Pflugh heard Peyton screaming "you hurt my mommy" and "holler[ing] that he hates his father." Pflugh testified that she spoke with Wendy and Tighe on a few occasions about arguing in front of Peyton. According to Pflugh, Tighe once admitted to her that he had told Peyton that he hated him and that he "was a piece of s***."

{¶38} Pflugh testified that she saw Wendy and Peyton for the last time about a week before they disappeared. Pflugh listened as Wendy told her about another argument with Tighe and about "how she [could not] take it anymore." According to Pflugh, Wendy never spoke about taking a vacation or going away for an extended period of time. In fact, Pflugh could not recall a single occasion when Wendy and Peyton had gone away for an extended period of time. Nor could she recall any occasion when Wendy closed her windows. Pflugh testified that it was customary for Wendy to leave all of the windows and blinds in her home open year round. She believed that it was around July 22, 2013, when she and her husband noticed that all of Wendy's windows were closed and her blinds were drawn. Pflugh testified that the windows remained

that way for about a week. Additionally, near the end of July, Pflugh began to notice a foul odor that she thought was coming from somewhere near the backyard.

{¶39} Pflugh described her and Wendy's duplex as having a shared deck off the back of the home with a child gate separating the two sides. She further described the backyard as being entirely enclosed by a high fence that was separated in the middle by a barrier they had erected to keep Pflugh's dogs on her side of the yard. Pflugh testified that she spoke with Tighe at some point after July 31, 2013, because she believed that the foul odor she smelled was coming from somewhere behind the fence on Wendy's side of the backyard. According to Pflugh, Tighe initially denied that he could smell anything, but, once the wind blew, he acknowledged that he could smell something.

{¶40} Pflugh testified that she became concerned when about ten days passed without her seeing Wendy or Peyton. Pflugh tried to call Wendy on her cell phone, but the calls went straight to voicemail, so Pflugh began asking Tighe where Wendy and Peyton were. Pflugh testified that Tighe initially stated that he did not know where Wendy and Peyton were. He then later stated that a man had picked up Wendy and Peyton in the middle of the night and had taken them somewhere while he was sleeping. Pflugh testified that, on a different occasion, Tighe told her that Wendy "probably found a sugar daddy and that's who she is with." Meanwhile, Pflugh learned from her boyfriend, Gregory Mordew, that he had also asked Tighe about Wendy's whereabouts. Mordew testified that Tighe said Wendy and Peyton had gone on vacation with Wendy's mother. Pflugh testified that, as more time passed without word from Wendy and Peyton, she repeatedly encouraged Tighe to call the police and to file a missing person's report. Pflugh later forced Tighe to do so when, on August 7, 2013, Marie Ralston came to the house

looking for Wendy and Peyton. She testified that she programmed the police department number in her cell phone, handed it to Tighe, and stood next to him until he made the call.

{¶41} Ralston testified that she drove to Wendy's home on August 7th because neither she, nor her granddaughter had been able to reach Wendy since July 23rd. Tighe answered the door when Ralston knocked, and she asked if she could speak to Wendy. Tighe replied that she was not at home, so Ralston asked when he expected her to be back. According to Ralston, Tighe informed her that he did not know when Wendy would return, that she had not been home for a week or two, and that she had gone camping with a friend. When Ralston pressed Tighe more about why Wendy would have gone camping, Tighe told her that Wendy and Peyton initially left for a few days and briefly returned before disappearing again in the middle of the night. Ralston then asked to take a look around the house so that she could see if Wendy had taken anything with her.

{¶42} Ralston testified that Tighe led her around the house. She observed that Wendy's bed had no sheets or blankets on it and that Wendy's purse was still there. She also learned that Tighe had Wendy's food stamp card and her bank card. According to Ralston, Tighe claimed that Wendy had given him the cards to use for food and other necessities while she was gone. Ralston testified that Tighe's possession of the cards "threw an immediate red flag" in her mind because Wendy and Tighe frequently fought over money and Wendy had specifically told him that he was not allowed to eat the food in the house. When Ralston finished looking around the house, she asked Tighe why he was not worried that he did not know Peyton's whereabouts. According to Ralston, Tighe's face lacked any expression and he asked: "Should I be?" Ralston then informed Tighe that she planned on going to the police station to see if they could locate

Wendy through her cell phone. Ralston testified that, when she last spoke with Wendy, she never mentioned any plans to leave the area or to go on vacation.

{¶43} Officer Nathan Ickes met with Ralston at the police station on August 7, 2013, when she came in to file a missing person's report. Officer Ickes testified that, while Ralston was at the station, Tighe also called to file a missing person's report. Tighe informed Officer Ickes that Wendy and Peyton had gone on vacation, but that he did not know where. He further informed Officer Ickes that he last saw them on July 23rd. Officer Ickes asked Tighe to complete a written statement, and Tighe agreed. Officer Ickes read Tighe's written statement into the record at trial. In his statement, Tighe wrote that he asked Wendy where she was going, but she informed him that it was "none of [his] business." Tighe further wrote that Wendy "said that Peyton knew the person [they were going with] and that she knew this guy for a long time." Tighe claimed that Wendy and Peyton left sometime on July 23rd while he was still sleeping.

{¶44} Gerald Ward testified that he used to live near Wendy, Tighe, and Peyton and used to work at the same company as Tighe. Ward testified that Tighe contacted him on August 9, 2013, to ask for a ride. Tighe informed Ward that he needed to find a storage unit because he, Wendy, and Peyton were being evicted. Ward agreed to help Tighe and drove to Wendy's house. He testified that he asked about Wendy and Peyton after he arrived because they were not there. According to Ward, Tighe told him that they went camping. Ward testified that he found Tighe's explanation suspicious because Wendy was not "the outdoor type" and he noticed Wendy's purse hanging on a chair in the house. He testified that, when he asked Tighe for more details about Wendy and Peyton's whereabouts, Tighe elaborated on his claim that they had gone camping. Tighe stated that Wendy had come downstairs with some blankets in preparation for a camping trip and that, while he was in the shower, she and Peyton left. Ward observed that

Tighe was acting oddly while he was there, getting up and looking out the window every time a car came down the street or a car door slammed. Ward testified that, after he helped Tighe out that day, he next saw him on August 11, 2013. On that day, the police brought Tighe to his house because Tighe needed a place to stay. Ward testified that Tighe told him his house was a crime scene and that the police were "probably going to accuse him of killing Wendy and Peyton."

{¶45} Marie Ralston testified that, after she spoke with the police on August 7th, she felt that they would not be able to help her find Wendy and Peyton. Accordingly, on August 10, 2013, Ralston called her sister and asked her to help look for them. Ralston testified that she was afraid that Wendy and Peyton had been harmed, so she decided to take her sister to search the woods behind Wendy's duplex. Ralston explained that there is a wooded area a ways behind the fence that surrounds Wendy's backyard and, beyond the wooded area, there is an apartment complex that one can reach by way of a separate road. Ralston and her sister drove to the parking lot of the apartment complex and walked into the woods, towards the direction of Wendy's duplex. In the area of the woods closest to Wendy's home, she and her sister discovered a navy blue bundle beneath a large bush. Ralston testified that there were flies everywhere around the bundle as well as a bad smell. After some discussion, she and her sister decided to notify the police regarding what they had found.

{¶46} Detective Michael Scholles testified that he was on duty when Marie Ralston came to the police station to report the bundle she and her sister had located in the woods behind Wendy's duplex. After Ralston pinpointed the location of the bundle for them on a map, Detective Scholles and several other officers drove to the woods to investigate. He testified that he and the other officers soon found two bundles beneath some brush in the woods behind

Wendy's duplex. Upon closer inspection, he saw that the bundles were composed of some type of bedding. Detective Scholles testified that the police opened the bundles enough to see that they contained human remains. Accordingly, the police contacted the medical examiner and began to search the area for clues.

{¶47} The State presented evidence that the woods behind Wendy's duplex are located near the top of a hill. The fence surrounding the backyard of Wendy's duplex is located at the bottom of the hill. The police found several items of interest near the bottom of the hill and the fence surrounding her backyard. First, Detective Scholles testified that the police discovered an additional area of what appeared to be soil decomposition at the bottom of the hill, closer to the fence. He indicated that there were maggots in the soil of the decomposition area and that the area was covered with branches that appeared to have been placed there as cover. Special Agent Brenda McNeely from BCI tested the decomposition area for the presence of blood and testified that she obtained a positive result. Second, there was testimony that, in between the decomposition area and the base of the hill, the police found a hole, covered by rocks, in which two juice cups were buried. There was testimony that, when the police executed a warrant at Wendy's home that evening, they looked inside Wendy's refrigerator and found juice cups that matched the two buried juice cups. Third, Detective Scholles testified that he discovered a piece of electrical tape in the brush adjacent to the fence line of Wendy's home. He testified that, during the search at Wendy's home, the police discovered rolls of electrical tape on the top of her refrigerator.

{¶48} Following the discovery of the remains in the woods, the police detained Tighe and he agreed to be interviewed at the police station. Detective Bohon testified that he led the investigation in this matter and was present for Tighe's interview. During his interview, Tighe

stated that it was not unusual for Wendy to leave for periods of time. Tighe stated that, a few days before Wendy left, she mentioned to him that she and Peyton would be taking a vacation. A few days later, Wendy said they were going on vacation with a man she had known for a long time and that she had made some type of arrangement with their landlord concerning the rent. Tighe stated that he thought Wendy and Peyton might have gone camping because Peyton mentioned something about borrowing his grandfather's tent. He stated that, when he woke up the next morning, Wendy and Peyton were gone. He denied that he and Wendy had any disagreements the day before she and Peyton left.

{¶49} Special Agent McNeely testified that she is a member of BCI's crime scene unit and was asked to assist on August 10, 2013, when the police found the two bundles in the woods behind Wendy's home. She testified that the bundles were comprised of some type of bedding material. The larger, blue bundle appeared to contain the decaying remains of one body while the smaller bundle appeared to contain the decaying remains of a smaller body. Special Agent McNeely testified that the bundles were only partially opened at the scene and that the smaller body was wrapped up along with what appeared to be a stuffed giraffe animal. Special Agent McNeely testified that maggots were present in both of the bundles and at the separate decomposition area at the base of the hill. There also was testimony that the police uncovered two cell phones near the area of the bodies and that the cell phones were later determined to be Wendy's.

{¶50} Dr. Lisa Kohler, the Summit County Medical Examiner, testified that she responded to the scene where the two bundles were found and that it was immediately apparent to her that they contained human remains. She testified that the bundles were partially opened at the crime scene and that she later fully opened them when conducting the autopsies. Inside a

blue comforter, Dr. Kohler discovered the remains of an adult. She testified that the blue comforter had been tied in a knot and, inside that comforter, was a floral-patterned comforter that had been encircled with black electrical tape. Once she opened both comforters, Dr. Kohler was able to see the remains of the adult wearing a tank top, bra, shorts, and underwear, but no shoes or socks. Dr. Kohler testified that the adult body was decomposed to the extent that she had to rely upon a forensic dentist to help her identify the individual. She used the information she received from the forensic dentist and the evidence she received from other sources to conclude that the remains were those of Wendy.

{¶51} Dr. Kohler testified that the second bundle she received was wrapped in a green fuzzy blanket. Inside the blanket, she discovered the remains of a young child, two baby blankets, and three stuffed animals: a giraffe, a dog, and a chipmunk. Dr. Kohler testified that, on the remains of the child, she found a t-shirt and shorts, but no underwear, socks, or shoes. Dr. Kohler ultimately concluded that the remains of the child were those of Peyton.

{¶52} Dr. Kohler testified that the state of Wendy's and Peyton's bodies did not allow her to perform a typical autopsy or to definitively determine a cause of death. She testified that Wendy did have a broken hyoid bone, the floating bone at the front of the neck. Although Dr. Kohler explained that a broken hyoid bone can be consistent with strangulation, she stated that there were other possible mechanisms that could cause that type of injury as well. Because she could not pinpoint the type of trauma that brought about Wendy's death, she testified that she listed Wendy's cause of death as unspecified violence. Likewise, Dr. Kohler concluded that Peyton's death was also caused by unspecified violence. She explained that the manner in which their bodies were wrapped and hidden in the woods contributed to her conclusions.

{¶53} When conducting Wendy's autopsy, Dr. Kohler testified that she preserved the electrical tape that she found wrapped around the comforter that held Wendy's remains. The State then submitted to BCI for testing the electrical tape wrapped around Wendy's body, the electrical tape found on the top of Wendy's refrigerator, and the piece of electrical tape that Detective Scholles found in the brush adjacent to the fence line of Wendy's home. Special Agent Donna Schwesinger, a trace evidence analyst at BCI, testified that she received the items and performed a fracture comparison on them.

{¶54} Special Agent Schwesinger explained that fracture comparison involves the re-alignment of two or more objects to determine whether the objects were once part of the same whole. To perform a fracture comparison, Special Agent Schwesinger testified that she makes a visual comparison before using a stereomicroscope to examine items more closely. She testified that the ends of the electrical tape wrapped around Wendy's body had been torn instead of cut. Because torn pieces have unique characteristics that stem from the application of random force, Special Agent Schwesinger testified, she was able to compare the tears on that electrical tape with the tears on the other items of electrical tape that the State submitted for testing. She ultimately concluded that the partial roll of electrical tape from the top of Wendy's refrigerator and the tape wrapped around Wendy's body had matching individual tear configurations such that they were once part of the same roll of tape. Additionally, she concluded that the loose piece of tape found in the brush adjacent to the duplex's fence matched a torn end of the tape wrapped around Wendy's body. Another BCI analyst, Special Agent Linda Eveleth, testified that she performed DNA testing on a swab taken from a roll of electrical tape on top of Wendy's refrigerator. She stated that Tighe could not be excluded from the partial DNA profile that she found on the roll of electrical tape.

{¶55} Detective Bohon testified that the police retrieved a camera from Wendy's duplex when they searched it. He stated that several of the pictures on the camera depicted the inside of Wendy's home. In those same pictures, one could observe the fuzzy green blanket, the two receiving blankets, and the floral-patterned quilt that were with Wendy's and Peyton's remains. Additionally, one could observe the stuffed giraffe animal that was wrapped in the bundle with Peyton. Detective Bohon testified that both BCI and the Federal Bureau of Investigation were able to extract certain information from the two cell phones that the police found near Wendy's body. He testified that both phones belonged to Wendy and evidenced that the last known communication she made was a social media status update at 9:56 a.m. on July 23, 2013. Detective Bohon testified that, based on his entire investigation, he believed that the murders of Wendy and Peyton occurred on July 23rd. He testified that the decomposition area the police found at the base of the hill behind Wendy's fence led him to conclude that Wendy's and Peyton's bodies were initially left in that area, but later moved to the woods after they had started to decompose. He further testified that he linked the movement of the bodies with the conversation that Pflugh had with Tighe, when she told him that she thought the foul odor she smelled was coming from behind Wendy's fence.

{¶56} Viewing all of the evidence in a light most favorable to the prosecution, we must conclude that the State presented evidence from which a rational trier of fact could have concluded that Tighe perpetrated the crimes here. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The State set forth a wealth of circumstantial evidence implicating Tighe. *See Taylor*, 2015-Ohio-403, at ¶ 9 ("[I]dentity may be proved by direct or circumstantial evidence * * *."). There was evidence that Wendy and Tighe had a stressful relationship and that Tighe also had a negative relationship with Peyton. Both Wendy and Tighe were suffering from

serious financial problems and both were unemployed and on the cusp of eviction at the time leading up to the murders. There was testimony that both Wendy and Peyton disappeared around July 23, 2013, and that, on that day, neighbors observed that all of the windows at Wendy's duplex were closed and shuttered. Tighe lived at the duplex before, during, and after the murders, and there was evidence that personal items taken from the duplex were either enclosed with or used to wrap the remains of Wendy and Peyton. There also was testimony that Peyton's body was wrapped up along with several stuffed animals to which he had a strong sentimental attachment. The State presented evidence that Wendy's and Peyton's bodies were initially left at the base of the hill behind the fence, but later moved after they began to decompose. A rational trier of fact could have concluded that, had someone other than Tighe murdered Wendy and Peyton, that individual would not have returned to the crime scene later on to move the bodies.

{¶57} There was testimony that Tighe waited until August 7, 2013, to report Wendy and his son missing and did so only because his neighbor forced him to call the police. Tighe gave varying accounts of Wendy's and Peyton's whereabouts. He told different individuals that they went on vacation, they went camping, they were with Wendy's mother, they were with some unknown man, they left while he was sleeping, and they left while he was in the shower. A rational trier of fact could have concluded that Tighe failed to consistently explain Wendy's and Peyton's whereabouts because none of his explanations was true.

{¶58} The record does not support Tighe's argument that his convictions are based on insufficient evidence because the State failed to prove identity. The State set forth evidence from which a rational trier of fact could have concluded that Tighe perpetrated the crimes here. Consequently, we reject his argument to the contrary. Tighe's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE VERDICTS IN THIS CASE WERE AGAINST THE MANIFEST WEIGHT EVIDENCE (sic) AND, AS A RESULT, APPELLANT TIGHE'S RIGHTS AS PROTECTED BY ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED[.]

**{¶59}** In his second assignment of error, Tighe argues that his convictions are against the manifest weight of the evidence. We disagree.

**{¶60}** When applying the manifest weight standard, appellate courts are required to consider the whole record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Courts are cautioned to only reverse a conviction on manifest weight grounds "in exceptional cases," *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340, where the evidence "weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

**{¶61}** Tighe argues that his convictions are against the manifest weight of the evidence because there was "nothing to connect [him] * * * to the crime scene or the murders" and the State's cases "hinged entirely on circumstantial evidence." His argument essentially mirrors his sufficiency challenge, as he has not undertaken any analysis of the persuasiveness of the State's evidence. *See State v. Wong*, 9th Dist. Summit No. 27486, 2016-Ohio-96, ¶ 32 ("[A]n assertion that evidence is lacking sounds in sufficiency rather than weight."). This Court has conducted an exhaustive review of the evidence in this matter, and we have already determined that Tighe's convictions are based on sufficient evidence. We will not develop a manifest weight argument

on his behalf. *See State v. Sadeghi*, 9th Dist. Wayne No. 14AP0051, 2016-Ohio-744, ¶ 32. "Because [Tighe] has not developed an argument to support his manifest weight challenge, we decline to conduct a manifest weight analysis." *State v. Shannon*, 9th Dist. Lorain No. 13CA010517, 2015-Ohio-438, ¶ 25, quoting *State v. Auerswald*, 9th Dist. Medina No. 11CA0053-M, 2013-Ohio-742, ¶ 50. Accordingly, his second assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE CUMULATIVE AND GRUESOME PHOTOGRAPHS OF THE VICTIMS ALL IN VIOLATION OF APPELLANT TIGHE'S RIGHTS TO A FAIR TRIAL AS PROTECTED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION[.]

**{¶62}** In his fourth assignment of error, Tighe argues that the trial court abused its discretion by admitting cumulative and gruesome photographs. We do not agree that the trial court abused its discretion.

**{¶63}** Generally, "[w]hen considering the admissibility of photographic evidence under Evid.R. 403, the question is whether the probative value of the photographic evidence is substantially outweighed by the danger of unfair prejudice to the defendant." *State v. Morales*, 32 Ohio St.3d 252, 257 (1987). "In the context of capital trials, however, [the Supreme Court of Ohio has] established a stricter evidentiary standard for admitting gruesome photographs and ha[s] strongly caution[ed] judicious use." (Internal quotations and citations omitted.) *State v. Brantley*, 9th Dist. Wayne No. 27466, 2016-Ohio-4680, ¶ 67. In capital cases, "[g]ruesome photos are admissible only if (1) their "probative value * * * outweigh[s] the danger of unfair prejudice" to the defendant and (2) they are "neither repetitive nor cumulative in nature." *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, ¶ 52, quoting *State v. Morales*, 32 Ohio St.3d 252, 258 (1987). "A trial court's decision that a photo satisfies this standard is reviewable only

for abuse of discretion." *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 96. An abuse of discretion means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶64} Tighe argues that the trial court erred by admitting a large number of photographs here because the photographs were repetitive and gruesome. He argues that he was prejudiced by their introduction because "[m]ost of the pictures had absolutely no probative value." According to Tighe, there was no dispute that Wendy and Peyton were murdered, so the only issue was the identity of their assailant. He argues that "[a] single picture could have satisfied the prosecution's needs to prove that there had been a crime."

{¶65} Tighe has not specifically addressed any of the photographs here, either individually or by group. The State introduced photographs through several witnesses because some of the photographs were taken at the crime scene and more were taken when Dr. Kohler autopsied the victims. The parties and the trial court had extensive discussions about the admission of the photographs and those discussions led to the State withdrawing twenty-five photographs, not including an additional five photographs that the court excluded. Of the remaining photographs, Tighe has not made any attempt to show that all of them are, in fact, gruesome. *See* App.R. 16(A)(7). For instance, several of the photographs only depict the blankets in which Wendy and Peyton were bundled. Because the photographs only show their bundled remains and not the remains themselves, the photographs are, arguably, not gruesome. *See State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 73 (photographs depicting body of deceased victim wrapped in an opaque plastic bag not gruesome). Tighe, however, has made no attempt to differentiate between the photographs that are gruesome and the photographs that, at least potentially, are not. *See* App.R. 16(A)(7).

**{¶66}** Although Tighe claims that most of the pictures here lacked any probative value, the photographs "gave the jury an 'appreciation of the nature and circumstances of the crimes.'" *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 26, quoting *State v. Evans*, 63 Ohio St.3d 231, 251 (1992). Tighe was not charged strictly with aggravated murder. As the trial court noted, the State also had to prove two counts of gross abuse of a corpse. The pictures taken at the crime scene were probative of the condition of the bodies at the time they were found and the manner in which they were mistreated. Meanwhile, the pictures taken by Dr. Kohler were probative of details not uncovered at the crime scene, as Dr. Kohler was the individual who identified the bodies and discovered the full contents of the bundles. The fact that Wendy's body was wrapped with the same electrical tape that the police found on her refrigerator and the fact that Peyton's body was wrapped along with three of his stuffed animals were highly probative of the identity of the perpetrator here. Further, the photographs evidenced that their deaths were purposeful and not the result of an accident or mistake. *See State v. Feaster*, 9th Dist. Summit No. 24367, 2009-Ohio-2558, ¶ 26 (photographs admissible when probative of purposefulness of murder, even when stipulation as to cause of death).

**{¶67}** Because Tighe has not conducted an in depth review of the photographs admitted here, we will not do so on his behalf. *See* App.R. 16(A)(7). As this Court has repeatedly held, "[i]f an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." *Cardone*, 1998 WL 224934, at *8 (May 6, 1998). The trial judge conducted an extensive review of the photographs here before admitting them and repeatedly referenced her obligation not to admit cumulative, gruesome photographs. Because Tighe has not challenged any of the trial judge's specific rulings on the photographs, we will not analyze each of her

individual rulings. Tighe has not shown that the trial court abused its discretion by admitting the photographs here. As such, his fourth assignment of error is overruled.

### III.

{¶68} Tighe's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

CARR, P. J.
MOORE, J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

DONALD R. HICKS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.