[Cite as *State v. Altomare*, 2024-Ohio-1721.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 21CA011827 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| AUSTIN ALTOMARE | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 20CR102328 |

DECISION AND JOURNAL ENTRY

Dated: May 6, 2024

HENSAL, Judge.

{¶1} Austin Altomare appeals his convictions by the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} On March 20, 2020, at approximately 11:45 p.m., a Lorain police officer heard gunshots that sounded like they were coming from an area north of his patrol area. The officer advised dispatch and drove toward the neighborhood where he believed the gunshots originated. On East 29th Street, the officer found a man in a state of partial undress standing in a driveway with his hands raised. The officer could see from his cruiser that a firearm lay on the ground next to the man. The officer exited his vehicle while drawing his own weapon and approached the man, who directed the officer's attention to the gun on the ground. As the officer ordered the man to step away from the weapon, the man told him that he had just murdered his wife. The man took further steps toward the officer and again told him that he had just shot his wife.

{¶3}    The officer handcuffed the man, who identified himself as Mr. Altomare, and once another officer arrived, he secured Mr. Altomare in the back of a cruiser.  The officer entered the house and went upstairs to the second-floor apartment, where the door was open.  He found evidence of a struggle in the kitchen.  In the living room, he found a female seated on the couch with an apparent gunshot wound to the head.  It appeared that the woman had labored breathing at the time, but the officer could not approach because a large pit bull was curled in her lap, growling.  Once the dog was secured, paramedics transported the woman from the apartment.  She succumbed to her injuries soon after.  Meanwhile, Mr. Altomare was taken into custody and interviewed by a detective.  During that interview, he identified himself as the shooter on numerous occasions.

{¶4}    Mr. Altomare was charged with murder in violation of Revised Code Section 2903.02(A) and three counts of murder in violation of Section 2903.02(B).  Mr. Altomare was also charged with involuntary manslaughter in violation of Section 2903.04(A), felonious assault in violation of Sections 2903.11(A)(1) and 2903.11(A)(2), and having a weapon under disability in violation of Section 2923.13(A)(4).  Each of these charges was accompanied by firearm specifications under Section 2941.141(A) and Section 2941.145(A).  In addition, Mr. Altomare was charged with possession of drugs in violation of Section 2925.11(A), using weapons while intoxicated in violation of Section 2923.15(A), and illegal use or possession of drug paraphernalia in violation of Section 2925.14.

{¶5}    Mr. Altomare moved to suppress all of the statements that he made to police, arguing that he was not informed of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966) or that he did not knowingly, voluntarily, and intelligently waive his rights; that he was denied his right to counsel; and that his statements were not voluntary because he was sleep-deprived and under the influence of drugs.  The trial court denied his motion to suppress.  Eight months before

trial, Mr. Altomare's attorney also filed a "Motion Seeking Order for Access to Client," in which he maintained that he should be permitted "unrestricted" access to Mr. Altomare in jail "beyond the times when attorneys are not permitted access." The trial court denied that motion as well.

{¶6} Before the trial court instructed the jury, the State dismissed the misdemeanor charges and some of the firearm specifications. The jury found Mr. Altomare guilty of the remaining charges and specifications. The trial court merged counts two, three, four, five, and six and their remaining firearm specifications into count one, murder under Section 2903.02(A), and its specification. The trial court sentenced Mr. Altomare to a stated prison term of fifteen years to life for murder. The trial court also sentenced him to prison terms of thirty months and eleven months, respectively, for the convictions for having a weapon under disability and possession of drugs. Those prison terms were to be served concurrently with each other but consecutively to the murder sentence. Mr. Altomare appealed, raising five assignments of error.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT VIOLATED MR. ALTOMARE'S SIXTH AMENDMENT RIGHT TO COUNSEL WHEN IT DENIED COUNSEL ACCESS TO HIS CLIENT.

{¶7} In his first assignment of error, Mr. Altomare argues that by denying his motion for unrestricted access to his client, the trial court denied him effective assistance of counsel. This Court does not agree.

{¶8} In *Geders v. United States*, 425 U.S. 80 (1976), the Supreme Court concluded that a defendant's right to counsel under the Sixth Amendment was violated by a court order that prohibited him from speaking with counsel during an overnight trial recess that bridged the gap between his direct and cross-examination testimony. *Id*. at 91. Under those circumstances, the Supreme Court noted that

[t]o the extent that conflict remains between the defendant's right to consult with his attorney during a long overnight recess in the trial, and the prosecutor's desire to cross-examine the defendant without the intervention of counsel, with the risk of improper "coaching," the conflict must, under the Sixth Amendment, be resolved in favor of the right to the assistance and guidance of counsel.

*Id.* Twelve years later, the Supreme Court considered another case in light of its intervening decision in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Perry v. Leeke*, 488 U.S. 272 (1989), the Supreme Court considered whether restricting access to counsel during a fifteen-minute recess required the same result. *Id*. at 274. The Supreme Court noted that *Geders*, which did not address whether the defendant suffered actual prejudice, was consistent with *Strickland* in that regard. *Id*. at 279-280. Noting that "direct governmental interference with the right to counsel is a different matter[,]" the court reasoned that "'[a]ctual or constructive denial of the assistance of counsel altogether' * * * is not subject to the kind of prejudice analysis that is appropriate in determining whether the quality of a lawyer's performance itself has been constitutionally ineffective." *Id.*, quoting *Strickland* at 692.

{¶9}    In *Perry*, however, the Supreme Court reached a different result, holding that the Constitution "does not compel every trial judge to allow the defendant to consult with his lawyer while his testimony is in progress if the judge decides that there is a good reason to interrupt the trial for a few minutes." *Id*. at 284-85. The difference between the two cases, as the Ohio Supreme Court has explained, is that a *Geders* violation involves "a complete deprivation of access to counsel." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 95. Not every restriction on counsel's ability to counsel with a defendant, therefore, violates the Sixth Amendment right to counsel. *Morris v. Slappy*, 461 U.S. 1, 11 (1983). The Supreme Court of Ohio has, therefore, "rejected attempts to extend *Geders* to cases involving less than a sustained deprivation of all access to counsel." *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 112. When a trial

court denies a defendant's request to be held in a facility closer to counsel, for example, a complete deprivation of access to counsel has not occurred, and it will not be presumed that the defendant was prejudiced by the interference. *See State v. Sanders*, 92 Ohio St.3d 245, 276-278 (2001); *State v Coleman*, 85 Ohio St.3d 129, 143-144 (1999).

{¶10} According to Mr. Altomare's motion, the correctional facility where he was held pending trial agreed to permit his attorney "unrestricted" access beyond the limitations that were ordinarily placed upon all attorneys. His motion also explained that, apparently due to a situation that arose in connection with the COVID-19 pandemic, his "unrestricted" access was later curtailed. Mr. Altomare did not maintain that he had suffered a sustained deprivation of all access to counsel. Indeed, he did not maintain that he had suffered a deprivation of access at all beyond the normal restrictions imposed on all individuals incarcerated in the correctional facility where he was housed. He further has not argued that normal restrictions at that time were unduly restrictive on account of any COVID-19 protocol then in place. Under these circumstances, we cannot conclude that the trial court's decision to deny him further unrestricted access was "a sustained deprivation of all access to counsel" that amounted to a *Geders* violation. *See Hancock* at ¶ 112.

{¶11} Mr. Altomare has also argued that he need not show prejudice in connection with the trial court's denial of his motion for unrestricted access. Based on this Court's conclusion that he did not suffer a sustained deprivation of all access to counsel, however, the *Geders* rule does not apply. Mr. Altomare has not argued that he was prejudiced by the trial court's decision, and this Court will not construct an argument regarding prejudice on his behalf. *See State v. Adkins*, 9th Dist. Wayne No. 22AP0022, 2023-Ohio-3000, ¶ 33. Mr. Altomare's first assignment of error is overruled.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED IN DENYING MR. ALTOMARE'S MOTION TO SUPPRESS BECAUSE THE EVIDENCE SEIZED WAS THE FRUIT OF AN UNCONSTITUTIONAL SEARCH AND SEIZURE IN VIOLATION OF DEFENDANT'S CONSTITUTIONAL RIGHTS.

{¶12} Mr. Altomare's second assignment of error is that the trial court erred by denying his motion to suppress his statements made at the scene and during the course of the interview that occurred after his arrest. This Court does not agree.

{¶13} Mr. Altomare appears to assert that the statements that he made to Officer Ball at the scene should have been suppressed because he was not informed of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Statements that are unsolicited and spontaneous, however, are not the product of interrogation, and *Miranda* does not apply in that situation. *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, ¶ 119. Mr. Altomare has not developed an argument on appeal in support of his argument that his statements to the officer who arrived first at the scene should have been suppressed, and this Court will not construct one on his behalf. *See State v. Tighe*, 9th Dist. Summit No. 27779, 2016-Ohio-7031, ¶ 22.

{¶14} Mr. Altomare also appears to suggest that the trial court erred by concluding that the statements made during the interview after his arrest should be suppressed because he was sleep-deprived and under the influence of drugs. In this appeal, Mr. Altomare has not developed this argument, and this Court declines to construct that argument on his behalf. *See id*. at ¶ 22.

{¶15} With respect to the voluntariness of his statements, Mr. Altomare's argument is based on evidence that was not in the record when the trial court denied the motion to suppress. Mr. Altomare acknowledges that the evidence to which he points in support of his arguments consists of his trial testimony and an affidavit submitted to the trial court in support of a motion to renew the motion to suppress. To the extent that Mr. Altomare attempts to support his argument

with reference to his trial testimony, that evidence cannot be considered when reviewing the trial court's decision denying his motion to suppress. "When reviewing the trial court's decision to deny a motion to suppress, this Court must confine our review to the evidence presented during the pretrial suppression hearing, 'because such evidence was the only evidence before the trial court when it ruled on the motion.'" *State v. Turner*, 9th Dist. Summit No. 28775, 2018-Ohio-3898, ¶ 11, quoting *State v. Weese*, 9th Dist. Summit No. 20769, 2002-Ohio-3750, ¶ 14 fn.2. Nor can the evidence submitted in support of his motion to "renew" his motion to suppress after the trial court's ruling be considered in connection with the suppression ruling itself. *See id.* That motion was, in effect, a motion to reconsider the trial court's suppression ruling, and Mr. Altomare has not assigned error to the trial court's order that denied that motion. His second assignment of error is therefore overruled.

### ASSIGNMENT OF ERROR III

> THE VERDICT IN THIS CASE IS AGAINST THE SUFFICIENCY OF THE EVIDENCE AND SHOULD BE REVERSED BECAUSE IT VIOLATES THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10, OF THE CONSTITUTION OF THE STATE OF OHIO.

{¶16} In his third assignment of error, Mr. Altomare maintains that his conviction for possession of drugs is supported by insufficient evidence. This Court does not agree.

{¶17} "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. Summit No. 24731, 2009-Ohio-6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins* at 390 (Cook, J., concurring). For purposes of a sufficiency analysis, this Court must view the evidence in the light most favorable to the State. *Jackson v. Virginia*, 443

U.S. 307, 319 (1979). We do not evaluate credibility, and we make all reasonable inferences in favor of the State. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). The evidence is sufficient if it allows the trier of fact to reasonably conclude that the essential elements of the crime were proved beyond a reasonable doubt. *Id.*

{¶18} Mr. Altomare was convicted of possessing drugs in violation of Section 2925.11(A), which prohibits any person from knowingly obtaining, possessing, or using a controlled substance. In support of his sufficiency argument, Mr. Altomare argues only that "JB testified that the drugs were his, [and] that he provided all of the drugs." This summary of the evidence is incorrect. Although J.B. testified that he brought some drugs with him that night, he also testified that Mr. Altomare and the victim of the shooting provided the LSD that they used. He testified that he saw Mr. Altomare and the victim use what he believed to be crushed Ecstasy, which he did not provide. In addition, Section 2925.11(A) prohibits both possession and use of a controlled substance, and both J.B. and Mr. Altomare testified that Mr. Altomare used LSD before the shooting. Viewing this evidence in the light most favorable to the State, the jury could reasonably conclude beyond a reasonable doubt that Mr. Altomare was guilty of possessing a controlled substance under Section 2925.11(A). Mr. Altomare's third assignment of error is overruled.

### ASSIGNMENT OF ERROR IV

THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND OF THE OHIO CONSTITUTION.

{¶19} Mr. Altomare's fourth assignment of error is that his convictions for murder and felonious assault are against the manifest weight of the evidence because the evidence indicates that J.B., not Mr. Altomare, was the shooter. This Court does not agree.

**{¶20}** When considering whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). As with any element of an offense identity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value. *See State v. Flynn*, 9th Dist. Medina No. 06CA0096-M, 2007-Ohio-6210, ¶ 12. *See also State v. Treesh*, 90 Ohio St.3d 460, 485 (2001), citing *Jenks*, 61 Ohio St.3d 259 at paragraph one of the syllabus.

**{¶21}** Officer Jamie Ball, who was the first officer to respond to the area where shots were fired, testified that as he pulled up to the address where the shooting occurred, he saw a partially undressed man standing in the driveway with his hands up. A firearm lay on the ground next to the man, who directed Officer Ball's attention to the gun. Officer Ball testified that he ordered the man to step toward him and away from the gun. The man, who identified himself as Mr. Altomare, told Officer Ball, "I just murdered my wife. Just arrest me." Officer Ball recalled that he continued to call Mr. Altomare toward him, and Mr. Altomare again stated, "I just shot my wife." Officer Ball testified that Mr. Altomare was "eerily calm" and seemed eager to talk. He observed no indications that Mr. Altomare was under the influence of drugs, although Mr. Altomare told him that he had been using LSD.

**{¶22}** Once backup arrived and Mr. Altomare was secured in the back of a cruiser, Officer Ball entered the residence with Mr. Altomare's permission. Officer Ball testified that he noticed

spent shell casings on the driveway as he approached, as well as two spent shell casings on the landing that led to the upstairs apartment. According to Officer Ball, the door to the apartment was open, and it appeared that a struggle had taken place. He discovered C.V. on the couch with an apparent gunshot wound to her forehead. Officer Ball testified that there was a large amount of blood in her lap, on the couch, and on the back of the couch. He noted that it appeared that C.V. had been shot while seated in the position in which she was found. Continuing to search the apartment, Officer Ball found a spent shell casing in the living room near C.V.'s body, a live round of ammunition in the kitchen, and another live round in what appeared to be a child's bedroom.

{¶23} Detective Christopher Kovach was assigned to document, gather, and process evidence at the scene. He testified that the gun found next to Mr. Altomare was a Glock .40 caliber semiautomatic. When the gun was collected, the empty magazine was found next to it on the ground. Detective Kovach also described unfired bullets and spent casings that were found in the apartment, noting that the unfired bullet in the child's bedroom was a Colt .40 caliber Smith & Wesson, as was the unfired bullet found in the kitchen. He testified that the casings found outside were the same make and type. Detective Kovach recalled that after he found a hole in the back couch cushion on the left-hand side, he searched unsuccessfully for a bullet fragment in and behind the couch. He also found a spent casing in the living room that was consistent with a round fired toward the couch where C.V. was found. Detective Kovach testified that a window located directly behind the couch was open when police entered the apartment. Like Officer Ball, Detective Kovach testified that it was apparent that there had been a struggle in the kitchen, noting the presence of a broken chair.

{¶24} Detective Kovach testified that he found substances that appeared to be drugs and various items of drug paraphernalia in the living room. He recalled that he also found an ID

belonging to J.B. in a wallet on the television stand and a backpack on the floor leaning against a recliner. Detective Kovach testified that inside the backpack, he found a 9mm semiautomatic handgun in a holster. The gun contained nine rounds, one of which was in the chamber. He recalled that after the police secured the scene and allowed C.V.'s mother and Mr. Altomare's father to access the apartment, they brought additional evidence to the attention of police. That additional evidence included more .40 caliber shell casings and what appeared to be a bullet fragment that was recovered from under the television stand. In summary, Detective Kovach testified that four shell casings found outside the apartment and three found inside the apartment were all Colt .40 caliber Smith & Wesson casings. He explained that there appeared to have been a minimum of eight rounds fired in the apartment and that the casings found in the child's bedroom and damage identified in the area of the kitchen was consistent with a shooter standing in the bedroom and firing toward the kitchen area.

{¶25} Detective John Dougherty interviewed Mr. Altomare. He testified that he advised Mr. Altomare of his *Miranda* rights at the scene and before the interview. He recalled that Mr. Altomare appeared to be calm and that he was lucid and awake throughout the interview. He did not notice any indication that Mr. Altomare was under the influence of drugs. Detective Dougherty testified that Mr. Altomare responded appropriately to questions, and he recalled that Mr. Altomare seemed coherent and understandable. During the interview, Mr. Altomare admitted at least sixteen times that he shot C.V., and he stated on multiple occasions that although J.B. had been there earlier in the evening, he had left before the shooting.

{¶26} Detective Dougherty testified that C.V. sustained a gunshot wound to the forehead, left of center, and the bullet traveled at a downward angle. He noted that stippling would be present if the shooter were near the victim when the shot was fired. Dr. Frank Miller, the Lorain County

Coroner, testified similarly. According to his testimony, the bullet entered C.V.'s left frontal scalp and traveled front-to-back, downward, and to the right before exiting the skull. He noted that there was stippling present all around the entrance wound, which indicated that the muzzle of the gun was relatively perpendicular to C.V. Dr. Miller estimated that based on the stippling pattern, the gun was probably one or two feet away from C.V., and he testified that the bullet could not have passed through anything else before it struck her. According to Dr. Miller, the photographs taken at the scene were consistent with C.V. being shot while seated where she was found, and he noted that C.V. could not have made any purposeful movements after sustaining her injuries. Dr. Miller testified that the gunshot wound was consistent with what would be inflicted by a .40 caliber firearm, although he acknowledged that it would also be consistent with a 9mm firearm.

{¶27} J.B., a friend of both Mr. Altomare and C.V., testified that he was with the couple on the evening of C.V.'s death. According to J.B., Mr. Altomare invited him to hang out on March 20, 2020, and he arrived at their apartment between 7:30 and 7:45 p.m. He anticipated that the plan for the evening was to hang out and use psychedelic drugs. He characterized Mr. Altomare as a habitual drug user and acknowledged that he may have been as well. J.B. testified that he brought MDMA and concentrated THC with him, but that Mr. Altomare and C.V. supplied LSD and marijuana in leaf form. J.B. also acknowledged that he brought a firearm with him that night, as was his pattern. He testified that he arrived with his 9mm gun holstered on his hip, but he explained that he placed it in his backpack soon after and did not remove it.

{¶28} According to J.B., the friends ate and used marijuana, then played rave music while each took seven hits of the LSD that Mr. Altomare and C.V. provided. According to J.B., they started to experience the effects of the drugs approximately an hour later. J.B. testified that he also saw Mr. Altomare and C.V. take what he believed to be crushed Ecstasy. He stated that he did not

provide Ecstasy and did not partake in it. J.B. explained that after he saw his friends use the Ecstasy, he saw Mr. Altomare standing in the kitchen with the .40 caliber firearm that he owned. According to J.B., Mr. Altomare was pacing and "seemed agitated." J.B. testified that although he tried to talk to Mr. Altomare, Mr. Altomare would not respond to him specifically. Instead, Mr. Altomare and C.V. went into the bedroom to talk. J.B. testified that after what seemed to be a heated conversation, Mr. Altomare came into the living room and held the muzzle of his firearm to J.B.'s head as he walked past.

{¶29} J.B. testified that Mr. Altomare left the living room, and he recalled that he heard three or four gunshots from another part of the apartment. J.B. recalled that he went into the kitchen to silence the smoke detector, which had activated. He testified that Mr. Altomare returned to the kitchen, told him to leave, then became angry. According to J.B., Mr. Altomare struck him with a kitchen chair, swung at him with a closed fist, then picked up a knife and told him to leave. J.B. testified that C.V. threw his car keys to him and he left through the kitchen door. He recalled that he did not have time to retrieve his backpack, and he testified that he had not removed his firearm from it during the course of the evening. J.B. also testified that at no time did he and Mr. Altomare struggle over Mr. Altomare's firearm. J.B. testified that as he went down the stairs, he noticed that Mr. Altomare was following him. He also testified that C.V. leaned out the open window behind the couch to speak to him before he got into his vehicle.

{¶30} J.B. recalled that after he drove part of the way home, he realized that he was under the effects of the drugs he had taken and should not have been driving. He testified that he called a friend, who agreed to pick him up from the parking lot adjacent to a bakery. The friend, M.W., also testified. He described J.B.'s demeanor as "overwhelmed" and "stressed," and he recalled that J.B. relayed what had just happened:

So, basically, what he had told me, at that time, was [Mr. Altomare] started firing the gun in the apartment. [J.B.] was trying to tell him to stop. * * * Things got physical. He got chased out of the house with a knife and he fled. He got outta there.

J.B.'s cellular phone records from the evening were consistent with the course of events that he and M.W. described.

{¶31} Mr. Altomare testified in his own defense. In some respects, his testimony was consistent with J.B.'s testimony: he testified that the three friends planned to use some drugs on the evening of the shooting, and he described their use of LSD. He insisted, however, that the window behind the couch was painted shut and had never been opened. According to Mr. Altomare, it was J.B. who provided the LSD, and both he and C.V. noticed something unusual about it, although he did not describe a taste consistent with contaminants. Mr. Altomare testified that he had a gun in his hand later in the evening, but he explained that it was because J.B. was wearing one on his hip throughout the night. According to Mr. Altomare, J.B. was "acting depressed" and "talking crazy." Mr. Altomare explained that the two men had an altercation because J.B. "was talking about killing us and killing himself." Mr. Altomare acknowledged that he was not fully aware of what was happening, but he testified that he and J.B. fought over the gun in Mr. Altomare's hand, which fired as a result. He also testified that he hit J.B. with a kitchen chair, but according to Mr. Altomare, the gun fired again when that happened.

{¶32} Mr. Altomare testified that his memory about what happened next was limited. Based on the fact that shell casings were found outside, he testified that he believed he must have shot at J.B. He also testified that he assumed that he went back into the house and found C.V., who had already been shot. Mr. Altomare explained that he had no memory of what happened after that.

{¶33} During cross-examination, Mr. Altomare agreed that he had no memory of C.V. being shot. He expressed the opinion that she did not shoot herself, but he acknowledged that because he had no memory of the shooting, he could not rule himself out as the shooter. Mr. Altomare also agreed with the position that there was no evidence that J.B. was the shooter, and he acknowledged that he was not testifying that J.B. killed C.V. He also acknowledged that shots that struck the refrigerator and kitchen wall were not the shots that killed her. Mr. Altomare's guess was that C.V. was shot by accident, but he stated, "I don't know if I actually did it."

{¶34} Mr. Altomare suggests that his convictions are against the manifest weight of the evidence because, with respect to the conflicts between his testimony and J.B.'s testimony, J.B. was not a credible witness. With regard to the identity of the shooter, however, Mr. Altomare's testimony was not in conflict with J.B.'s testimony. Neither man identified the shooter—according to J.B.'s testimony, because he was no longer present at the scene; according to Mr. Altomare's testimony, because he did not remember what happened. Mr. Altomare acknowledged that he could not testify that J.B. was the shooter and, conversely, could not testify that he was not. To the extent that Mr. Altomare's testimony implied that C.V. was shot accidentally when the firearm discharged during a struggle, the physical evidence contradicts that hypothesis. In addition, both Mr. Altomare's spontaneous statements after the shooting and his responses to the questions posed to him during his interview were unequivocal: on the night of the shooting, he repeatedly stated that he shot C.V.

{¶35} This Court cannot conclude that this is the exceptional case in which the evidence weighs heavily against the convictions. *See Otten*, 33 Ohio App.3d at 340. Mr. Altomare's convictions are not against the manifest weight of the evidence, and his third assignment of error is overruled.

**ASSIGNMENT OF ERROR V**

THE TRIAL COURT'S ERRORS, WHEN TAKEN TOGETHER AND CONSIDERING THE CUMULATIVE ERROR DOCTRINE, DEPRIVED APPELLANT OF A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION SIXTEEN OF THE OHIO CONSTITUTION DUE PROCESS CLAUSE.

{¶36} Mr. Altomare's fifth assignment of error argues that even if none of his alleged errors, standing alone, warrants reversal of his convictions, the cumulative effect of those errors deprived him of a fair trial. "Under the doctrine of cumulative error, 'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal.'" *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, ¶ 156, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 223. Because Mr. Altomare has not demonstrated the presence of multiple errors, however, the cumulative error doctrine does not apply in this case. *See State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 132. Mr. Altomare's fifth assignment of error is overruled.

## III.

{¶37} Mr. Altomare's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

CARR, P. J.
FLAGG LANZINGER, J.
CONCUR.


APPEARANCES:

GIOVANNA V. BREMKE, Attorney at Law, for Appellant.

J.D. TOMLINSON, Prosecuting Attorney, and LINDSEY C. POPROCKI, Assistant Prosecuting Attorney, for Appellee.